## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COMPAGNIE DES BAUXITES DE GUINEE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **2:04cv393** |
| ) | **Electronic Filing** |
| **THREE RIVERS INSURANCE COMPANY and UNION GUINEENNE D'ASSURANCES,** ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM ON SCOPE OF COVERAGE</u>

The central and pivotal issue presented in this protracted litigation is the proper basis for valuation/adjustment of Compagnie Des Bauxites De Guinee's ("CBG" or "plaintiff") insurance claim for losses arising out of the June 25, 2001, structural collapse of a large piece of mining equipment known as Stacker/Reclaimer No. 2. Plaintiff contends that the basis for valuation/adjustment is the cost to "replace new" and that its ultimate decision to replace Stacker/Reclaimer No. 2 is to be assessed and evaluated by the finder of fact based upon "whether a reasonable, informed business man who was not insured would conclude under all of the circumstances that it was more commercially reasonable to repair the property rather than to replace it." Plaintiff's Amended Pretrial Narrative Statement (Doc. No. 74) at 20. Plaintiff insists that utilization of this standard is appropriate in order to inform the finder of fact's determination regarding the parties' intent as to a purportedly ambiguous valuation formula contained in the operative "Global All Risk Policy" of insurance. Plaintiff's Opposition to Defendants' Motion in Limine No. 6 (Doc. No. 129) at 6. Defendant contends that the basis for valuation/adjustment is the cost of "repair" if the mining equipment can, through repair, be returned to the condition it was in prior to the covered loss. Defendants' Amended Pretrial

Narrative Statement (Doc. No. 80) at 2. It contends that Stacker/Reclaimer No. 2 could have been so repaired, and accordingly plaintiff is attempting to recover more than that to which it is entitled under the policy. Id. Several of the parties' cross motions *in limine* amplify and augment these respective positions.

Consideration of parties' pretrial submissions as a whole make clear that declaratory relief is appropriate prior to trial. Accordingly, after consideration of all of the parties' submissions, all pertinent evidence in the record and the controlling and persuasive authorities on the matters at issue, the court concludes that (1) the insurance contract is clear and unambiguous; (2) defendants may pursue the defense of limiting liability to that portion of plaintiff's damages that would have been attributable to a successful repair of Stacker/Reclaimer No.2; (3) defendants bear the burden of proof and persuasion on this defense; and (4) bifurcation and submission of this defense to the trier of fact is appropriate prior to proceeding with evidence and factual determinations pertaining to the amount of plaintiff's damages.

Pennsylvania's rules of insurance contract interpretation are well established. 401 Fourth Street, Inc. v. Investors Insurance Group, 879 A.2d 166, 171 (Pa. 2005). Interpretation of an insurance contract generally is a task to be performed by the court rather than a jury. Id. (citing Madison Construction Co. v. Harleysville Mutual Ins. Co., 735 A.2d 100, 106 (Pa. 1990) and Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)). This general rule is derived from the approach followed in all areas of contract law. See Gonzalez v. U.S. Steel Corp., 398 A.2d 1378, 1385 (Pa. 1979) ("For a variety of reasons the common law has long thought it best to leave to the court than rather to the jury the essential factual question of what the contracting parties intended.") (quoting Community College of Beaver County v. Society of the Faculty, 375 A.2d 1267, 1275 (Pa. 1977)). Adherence to this approach "contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike." Id. (quoting Restatement (Second) of Contracts § 283, Comment d. In contrast, "a question of interpretation of an integrated agreement is to be

2

determined by a trier of fact if it depends on the credibility of extrinsic evidence or on a choice of reasonable inferences to be drawn from extrinsic evidence." Id. (citing Restatement (Second) of Contracts § 238(a); Ram Construction Co., Inc., v. American States Ins. Co., 749 F.2d 1049, 1052 (3d Cir. 1984) (same).

"The purpose of [interpreting an insurance contract] is to ascertain the intent of the parties as manifest by the terms used in the written insurance policy." 401 Fourth Street, Inc., 879 A.2d at 171 (citing Gene & Harvey Builders Inc. v. Pennsylvania Manufacturers' Association Ins. Co., 517 A.2d 910, 913 (Pa. 1986)). "When the language of the policy is clear and unambiguous, the court is required to give effect to that language." Id. In contrast, when the language in question is ambiguous, a construction which favors the contract's primary purpose of providing the insured with indemnification is to be favored. Id.

Where the intent of the parties cannot definitively be discerned from the language of the agreement, the potential for an ambiguity arises. "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" 401 Fourth Street, Inc., 879 A.2d at 171. The inquiry is not to be conducted in a vacuum. Madison Construction Co., 735 A.2d at 106. Instead, contractual terms will be recognized as ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." Id. However, it is improper to "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." Id. (citing Steuart, 444 A.2d at 663.

Where the potential for an ambiguity arises, it is proper to consider any extrinsic evidence offered by the parties and inquire into the circumstances surrounding the execution of the document "in an effort to clarify the meaning that the parties sought to express in the language which they chose." Burns Mfg. Co., Inc., v. Boehm, 356 A.2d 763, 766 n.3 (Pa. 1976); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). It is only when consideration of the extrinsic evidence surrounding the execution of the contract does not resolve

3

the ambiguity that resort to the rules of construction is appropriate. Id.; Eastern Associated Coal Corp. v. Etna Casualty & Surety Co., 632 F.2d 1068, 1075 (3d Cir. 1980).

Where both parties to an insurance contract had equal bargaining power during contract negotiations, the rule of construction calling for a policy to be construed strictly against the carrier as the drafter does not apply. Eastcoast Equipment Co. v. Maryland Casualty Co., 218 A.2d 91, 98 (Pa. Super. 1966). Nevertheless, where a true ambiguity arises and the language in question is reasonably susceptible of two different meanings, one of which favors coverage, the policy will not be construed in a manner that defeats the insured's reasonable expectations. Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903-07 (3d Cir. 1997). And this doctrinal approach is to be followed even where the insured is a sophisticated party to a freely negotiated agreement. UPMC Health Systems v. Metropolitan, 391 F.3d 497, 502 (3d Cir. 2004).

The polestar of the court's inquiry is the language of the insurance policy. Several rules of interpretation come into play when a court is called upon to ascertain the intent of the parties as reflected in the provisions of an insurance contract. First, in examining such language to determine what the parties intended, "the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." 401 Fourth Street, Inc., 879 A.2d 171 (quoting Steuart, 444 A.2d at 662). And in doing so the court is not to "consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties." Id.

Second, when words of common usage are used in an insurance policy, they are to be construed in their natural, plain and ordinary sense. Madison Construction Co., 735 A.2d at 108 (citing Easton v. Washington County Ins. Co., 137 A.2d 332, 335 (Pa. 1957) and Blue Anchor Overall Co. v. Pennsylvania Lumbermans Mutual Ins. Co., 123 A.2d 413, 415 (Pa. 1956)). In contrast, where the parties utilized terms that have established understandings within a specialized industry, consideration of those established understandings and meanings is appropriate in ascertaining the parties' intent. See Jacobs v. CNG Transmission Corp., 332 F.

4

Supp.2d 759, 779 n. 11 (W.D. Pa. 2004) (citing Hummel v. McFadden, 150 A.2d 856, 862 (Pa.

1959); Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 388-90 (Pa. 1986); Blue Anchor

Overall Co. v. Pennsylvania Lumbermans Mutual Ins. Co., 123 A.2d 413, 415 (Pa. 1956) ("if

technical words are used, they will be construed in their technical sense unless a contrary

intention clearly applies.").

Furthermore, where terms commonly used in insurance policies have acquired settled

meanings, a new meaning cannot be ascribed to any such term absent express language in the

policy indicating such a change was intended.   Farber v. Perkiomen Mutual Ins. Co., 88 A.2d

776, 779 (Pa. 1952).  To do so would run afoul of the constitutional prohibition against

impairment of contracts. Id.  The Supreme Court of Pennsylvania has opined:

> The legal meaning of [a specific insurance term] having
> been determined and established by prior decisions of this court,
> we cannot now depart therefrom without impairing the obligation
> of the contracts as written.  Nor is there any legally meritorious
> basis for suggesting the necessity for a change in the interpretation
> of the contracts.  The defendant companies prepare their own
> policy forms and presumably exclude therefrom anything from
> which they desire not to assume liability.  Moreover, insurance
> companies are, of course, conversant with germane court
> decisions .... Any change in the defendant's policies in order to
> avoid in the future the impact of our prior decisions is for them
> to ponder.  What they presently seek cannot justly be accorded
> by court decision.

Id.  And this long established principle is particularly forceful where the term or phrase in

question has a long history in the courts of Pennsylvania.  See Kane v. State Farm Fire and

Casualty Co., 841 A.2d 1038, 1045-1049 (Pa. Super. 2005) (long-settled understanding of the

term "actual cash value" controls absent explicit language in the policy defining the term

differently).

Plaintiff contends that the policy is ambiguous because its right to receive replacement

costs is reflected in three separate sections.  These sections provide:

12.    **VALUATION**.

In case of loss, the basis of adjustments shall be as follows:

5

\*      \*      \*

**B. Real and Personal Property.**

(1) Buildings, structures, furniture and fixtures, machinery, equipment, improvements and betterments, shall be valued at the replacement cost new on the same premises, as of the date of replacement.

(2) Electronic data processing or control equipment and production machinery and equipment or any part thereof shall be valued at the cost to repair or replace new on the same premises as of the time of replacement except, that with respect to items for which replacement with identical property is impossible, the replacement costs shall be the costs of the items similar to the destroyed property and intended to perform the same function but which may include technological advances.

\*      \*      \*

(7) Permission is granted for the insured to replace the damaged property with any property at the same site or at another site within the territorial limits of this policy, but recovery is limited to what it would cost to replace on the same site.

Global All Risk Policy (Doc. No. 129-2) at Section 12.

According to plaintiff, the language in those three sections, in conjunction with the lack of an option for the insurer to control the decision between repair and replacement, create two possible alternative interpretations. First, the court could review the wording of Section 12 as a whole, and discern that the contract expressly delegates to plaintiff the right to select replacement costs over repair for damaged property. In light of this delegation, "the insurer is obligated to pay the costs associated with the option chosen by the insured, subject only to the affirmative defense that the insured's decision was so erroneous as to be arbitrary." Plaintiff's Opposition to Defendants' Motion *in Limine* No. 14 (Doc. No. 136) at 4. In the alternative, the court would be forced to conclude that the contract is ambiguous, apparently due to what plaintiff assumes to be vague and indefinite language regarding how the valuation of production machinery is to be resolved under the present circumstances.

Defendant contends construction of an insurance policy is a matter committed to the court and the only provision at issue is Section 12(B)(2) because Stacker/Reclaimer No. 2 was

6

indisputably production equipment. Therefore, it contends the proper valuation must be limited to the cost of repair.

Plaintiff's attempt to contrive the various provisions of Section 12 into a state of ambiguity of its liking is unavailing. The language employed by the parties with regard to valuation of production equipment is clear and unambiguous. Careful consideration of the settled meaning of the terms employed and the various valuation provisions as a whole demonstrate that the parties intended the terms "repair" or "replace new" to serve as alternative measures that respectively limit each other based upon the degree of damage caused by a covered loss to production machinery and equipment. And the parties' careful articulation of the insured's option to elect between alternative valuations regarding other types of damaged property inescapably leads to the conclusion that construing the policy in such a manner is the only reasonable interpretation regarding their intent. Several factors and aspects of the agreement support this assessment.

First, consideration of the terms and structure of Section 12(A)(2) make clear that property to be valued at replacement cost new will be in a condition distinct from damaged property to be valued at the cost of repair. The term "repair" as used in a first-party property insurance contract has a long-settled and well-understood meaning, both in the insurance industry in general and in the Commonwealth of Pennsylvania in particular.

The term "repair" generally means "to restore to sound condition after damage or injury." Hall v. Acadia Ins. Co., 801 A.2d 993, 995 (Me. 2002) (quoting Webster's II: New Riverside University Dictionary). And "[a]s commonly used, the word 'repair' means to fix by replacing or putting back together what is broken, or ... to bring back to good or usable condition." Id. (quoting "O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 290 (Del. 2001) and Carlton v. Trinity Universal Ins. Co., 32 S.W. 3d 454, 464 (Tex. App. 2000)). In other words, as used pursuant to its common and ordinary meaning "the act of repairing an object typically focuses on restoring the object's function and purpose, and not upon returning the object to its earlier worth

7

or value." Id. See also The Oxford Dictionary and Thesaurus, American Edition, Oxford University Press 1996 (defining repair as restoring "to good condition after damage or wear" or "the act or the instance of restoring to sound condition" or putting in "good or relative condition for working or using."). The use of the term "repair" in a first-party property insurance contract generally is recognized as an intent to utilize this common and ordinary understanding. Hall, 801 A.2d at 1095-96 (concluding that the term "repair" was unambiguous, extended "only to the loss that can be repaired as that term is commonly understood" and collecting cases employing that common understanding).

Property insurance contracts commonly give insurers an option to repair, restore or replace damaged property in lieu of paying for an insured loss. See 12 Couch on Insurance 3d § 176:1. Such a provision generally is recognized as valid, and is included for the benefit of the insurer so that it may exercise the election as it deems advisable. Id. at 176:2. As a general condition to the exercise of an option to repair or rebuild, it is essential that the property be in such a condition that it is capable of being repaired or rebuilt and thereby being restored to its condition prior to the loss. Id. at §176:4. Where property cannot be so repaired or restored, the insurer cannot discharge its obligation by attempting to make restoration or reconstruction-which by definition will be unsuccessful. Id.

Whether a restoration or repair will be successful generally is a question for the trier of fact, unless it is conclusively demonstrated that any such effort cannot conform with valid governmental restrictions or reasonable construction or repair practices. Id. Similarly, repair and restoration options are by definition inapplicable to occurrences resulting in a "total loss." Id. Different jurisdictions employ different tests to determine the degree of destruction to property necessary to constitute a total loss, including "the identity tests, the restoration to use test, the absence of value test, or some composite of the foregoing." Id. at §175:65.

Within this general framework litigation has often arisen wherein an insurer has tendered repair or restoration of insured property and the insured seeks a monetary recovery pursuant to

8

the theory that the proposed repair or restoration would not produce property that would be the same as before the loss. From this litigation it has become well established that an insurer cannot avoid liability by an offer to repair or restore property which has been so far injured as to be incapable of repairs or where it cannot be restored to the condition it was before the disaster or to the condition that makes it practically as good and as serviceable as before the loss. See e.g. National Fire Ins. Co. of Hartford v. McCoy, 239 P.2d 428, 431 (Okla. 1951) ("the rule is stated in The Law of Insurance by Joyce (second edition) paragraph 3158, as follows: 'Nor can insurer avoid liability by an offer to repair a building which is so far injured as to be incapable of repairs, or where it cannot be restored to the condition it was before the disaster or to a condition practically as good or as serviceable as before the loss.'"). And this rule is equally applicable to real and personal property. Id. (applying principle to action involving personal property and citing in support other jurisdictions doing the same).

The concept of repair in first-party property insurance policies also has a well-understood meaning in Pennsylvania jurisprudence. In Keystone Paper Mills Co. v. Pennsylvania Fire Ins. Co., 139 A. 627 (Pa. 1927), the Supreme Court of Pennsylvania was called upon to review a verdict on five policies of insurance in an action to recover for production machinery damaged by a fire. The insured owned a large piece of production machinery used to make exceptionally difficult-to-produce high-grade quality paper. The machine was over a hundred feet long, nine feet wide and weighed approximately one hundred tons. It had many different series of roles and presses, gears and canvas belts over which the material passed in the production process. It had taken the labor of eight to ten men approximately two months to assemble the machine on foundation plates. It had to be precisely level, and many of its parts had to be true to the extent of one to two one-thousands of an inch. It had a daily production capacity of approximately ten tons. It was located next to the waxing room, where many tons of ordinary paper, large quantities of wax paper and thousands of pounds of paraffin were stored.

One night a fire ensued in the waxing room. Through openings in the wall the flames

9

swept across the paper machine. It was subjected to a continuously hot fire for three hours, the fire being so hot it melted the babbit bearings. This required exposure to a temperature of about six hundred degrees. An overhead sprinkling system went off and a fire hose plied water on the machine in a constant flow for hours.

After the fire the insured sued for the difference between the value of the machine before and after the fire, contending and presenting evidence suggesting the machine was useless. Two companies had made offers to repair the machine, but the insurance company declined to exercise its option to repair, and instead sought to defend on the basis that the cost of repair would have been less than the value of the claimed loss after an adjustment for depreciation. Id. at 628-30.

In affirming the judgment for the insured, the Supreme Court of Pennsylvania aligned Pennsylvania law with the general body of law discussed above. It opined:

> It appears that two companies made offers to repair, but neither offer was sufficient to give to the insured that which the policy contemplated, a machine as good and as serviceable as it was before the fire. The insurance company, under the option to repair or rebuild, if it elects to avail itself of the privilege, is not only bound to put the property in substantially the same state or as good as it was before the fire, but the insurer cannot avail itself of any relieving circumstance unless such repairs make the property as serviceable as it was before the loss. Joyce on Insurance, Par. 3158; Hartford Fire Insurance, Co. v. Peebles's Hotel Co., C. C. A.) 82 F.546. An insurance company cannot avoid its responsibility under the policy or minimize its damage by an offer to repair property which is so far injured as to be incapable of repairs, or where it cannot be restored to a condition it was in before the fire, or to a condition as serviceable. Joyce on Insurance, supra. In all controversies as to the condition of a building or machinery after a fire, the question as to whether the property has been so far damaged as to be beyond repair or service is a question for the jury, whose determination, depending as it does on oral testimony, will be conclusive.

Id. at 429-30. The court went on to observe that it was proper for the trial judge to submit the case to the jury pursuant to a charge that permitted them to limit recovery to the cost of repair, provided they "find that the machine could have been repaired for the amounts contained in the offers to repair so that it would have been substantially as good and serviceable as it was before

10

the fire," notwithstanding that the carrier had declined to exercise it's option to control the repair. Id. at 630.[1]

Subsequent Pennsylvania cases have continued to adhere to and employ this common understanding of the term "repair." See Gambale v. Allstate Ins. Co., 228 A.2d 58, 60 (Pa. Super 1967) (amount of recovery for damages to personal property turns on the question of whether the proposed repair would restore the property to the same condition it was before the accident) (collecting cases in support). And other jurisdictions have employed this common understanding of the term as well. See Interstate Ins. Co. v. Logan, 109 A.2d 904, 906 (Md. 1954) (to "repair" damaged property means to "put the property back in substantially the same condition or as good condition as it was in before the loss, and the repairs must make the property as serviceable as it was before the loss." (citing Keystone Paper Mill, 139 A. at 629; Cocklin v. Home Mutual Ins. Ass'n of Iowa, 222 N.W. 368 (Iowa 1928)); Northwest Nat. Ins. Co. v. Woodward, 45 S.W 185, 187 (Tex. App. 1898) (the repair of property means to restore it to the condition it was in before the loss or to a condition practically as good); Tidewater Equipment Co., Inc., v. Reliance Ins. Co., 650 F.2d 503, 509 (4th Cir. 1981) (to repair property rather than replace it means to put the property "in substantially the same condition as it was before the loss, and the repairs must make

---

[1] The court explained that the carrier must affirmatively exercise such an option, and when it does so, it "at all times assumes the responsibility for the success of the repairs." When the insurer does so, a different contract is created pursuant to the doctrine of elections. The court explained:

> Nor will an offer to repair by a third person be considered as the exercise by the company of its option unless made with the authority under the direction of the company which at all times assumes the responsibility for the success of the repairs. Where the insurer elects to and does repair, that part of the contract with regard to loss ceases to control, and a different provision of the policy operates. The insurer in attempting repairs agrees to rebuild and the rights and responsibilities are to be measured accordingly; and any resulting damages are based on the contract to rebuild or repair. This may be more or less than the total insurance. Fire Association v. Rosenthal, 108 Pa. 474, 1A.103.

Id. at 630.

the property as serviceable as it was before the loss.") (citing Couch on Insurance 2d § 54.30, p. 338 (1966) and <u>Venable v. Import Volkswagon</u>, 519 P.2d 667 (Kan. 1974) (same)).

Similar to the term "repair," the concept of "replacement" insurance has a settled meaning. "Replacement cost coverage was devised to remedy the shortfall in coverage which results in a property insurance policy compensating the insured for 'actual cash value' alone." 12 Couch on Insurance §176:56 at p.176-49. A standard policy compensating an insured for actual cash value of damaged or destroyed property typically places upon the insured the burden of bearing the cash difference to replace old property with new property.[2] In contrast to actual cash value, "replacement cost insurance allows recovery for actual value of the property at the time of the loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value." Couch on Insurance §176:56 at p.176-49. Thus, by including in the valuation section pertaining to production equipment "the cost to ... replace new" as an alternative to repair, it is clear the parties contemplated valuation of damaged or destroyed property above actual cash value, which valuation would permit plaintiff to replace old property with new property without reduction for deterioration, obsolescence or similar depreciation under appropriate circumstances.

The central issue raised by the parties' dispute is whether plaintiff's entitlement to "the cost ... to replace new" for covered damage to production machinery and equipment was intended to be limited by the alternative "cost to repair." Plaintiff essentially concedes that the concept of repair was intended to limit the ability to obtain new replacement cost in at least in some circumstances and proposes a standard of "commercial reasonableness" as the appropriate yard

---

[2]The policy at issue contains the following provision providing for actual cash value:

> If the property is not repaired, replaced, reproduced or reinstated, then the basis for adjustment shall be the actual cash value on the date of loss unless the insurer is legally liable for, or has agreed to insure for, a higher amount.

Global All Risk Policy at Section 12.

12

stick, as further limited by an affirmative defense of showing the insured's election was so erroneuos as to be arbitrary. The difficulty with this approach is that the concept of commercial reasonableness appears neither in the insurance policy nor the long-standing authority informing the use of the terms and concepts the parties incorporated into the Global All Risk Policy. And while plaintiff's proposed standard would produce the same decision as would application of the settled definition of repair in cases of complete destruction or a total loss of any insured property, it would have a tendency to elevate replacement cost and emasculate the concept of repair in situations where there is only partial injury or damage to the property and the value of the property is factored into the array of pertinent factors being considered. And this tendency would be increased concomitantly with the age, depreciation and importance of the property to the insured's business operations. Because a review of the pertinent policy provisions indicates that the parties intended to limit the option of replacement costs through application of the well-settled understanding of the concept of repair, and neither the policy nor the applicable authority provide any support for plaintiff's proposed "commercial reasonableness" reading/approach, and the standard of distinguishing between repair and replacement based on decisions of "commercial reasonableness" would have an unsupported tendency to elevate replacement cost over repair in circumstances where achieving long-term value would be more important than returning the property to an equivalent state of usefulness, we must (1) decline plaintiff's invitation to engraft such a standard into the Global All Risk Policy as inconsistent with the parties' intent and (2) reject such a construction of the policy as unreasonable.

The structure and language employed throughout the Global All Risk Policy indicate the parties intended to limit replacement cost of production equipment through the application of the well-defined concept of repair. When considered in conjunction with the settled understandings noted above, the very structure of Section 12(B)(2) indicates that such a limitation is intended. The very notion that replacement cost coverage is to be applicable when property is incapable of being restored to its pre-loss condition through repair is evident from the additional language  the

13

parties included within that section. In defining the scope of replacement costs when "replacement with identical property is impossible," the parties indicated that "replacement costs shall be costs of items similar to the <u>destroyed</u> property and intended to perform the same function ... ." Global All Risk Policy at 12(B)(2) (emphasis added). Destroyed property is by definition property which cannot be repaired. <u>Accord</u> <u>National Fire Ins. Co. Of Hartford v. McCoy</u>, 239 P.2d 428, 514 (Okla. 1951) ("It would be useless to allow defendant to replace the stolen items upon an airplane that was totally destroyed. Such a construction of the policy contract would be entirely outside the intention of the parties at the time of contracting."). The use of such language in the very section defining valuation for production machinery and equipment provides strong evidence that the parties viewed the alternatives of cost to repair or replace new as having separate and distinct spears of operation.

Moreover, other sections and provisions in Section 12 indicate the parties intended the alternatives of repair or replace new to be distinctly applicable within their respected spears of operation and not alternatives available at the insured's commercial discretion. For example, in the case of a loss to stock, whether raw, in process or finished, replacement cost as of the date of replacement may be elected "at the option of the insured" in lieu of actual cash value. Global All Risk Policy at Section 12(B)(4). Similarly, the insured is expressly given an option to value the loss of property of others at the replacement cost new as of the date of replacement instead of the stipulated value reflected in the written agreement between the insured and the third party property owner. Global All Risk Policy at Section 12(B) (4). These valuation provisions within the same section of the Global All Risk Policy indicate the parties clearly understood how to give plaintiff the option to elect replacement cost new over alternative valuation measures and did so where they agreed that such an option was appropriate. The fact that they omitted such an option from the valuation of production machinery and equipment speaks volumes regarding their intent to have the costs to repair or replace new operate as alternatives that would be made

14

operative based on the circumstance and degree of the injury and destruction to such property.[3]

The parties likewise carefully segmented those forms of property loss that would be valued at replacement cost new, regardless of whether such property could be repaired. These forms include buildings, structures, furniture and fixtures, machinery, equipment, improvements and betterments. Specifically excluded from the unrestricted ability to recover replacement costs new is production machinery and equipment. The precision and detail the parties employed in providing full replacement cost coverage for such property regardless of the degree of damage or destruction indicates clearly that they did not carelessly or haphazardly include the cost to repair as an alternative for loss to production machinery and equipment.

The parties also drew similar distinctions with regard to the length of time for which a loss may be claimed, which except for business interruptions "shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace the property that has been destroyed or damaged." Global All Risk Policy at Section 7 (H)(1)(a)(i). Limiting the length of time in this manner clearly reflected recognition that rebuilding, repairing or replacing destroyed or damaged property would be limited to the length of time necessary to accomplish the restoration or replacement diligently. Clearly, a right to elect between repair or replacement based on commercial reasonableness instead of the utility resulting from a repair where the policy provides those alternative measures without such an expressed option would render such time limitations superfluous or illusory.[4]

---

[3]The nature of plaintiff's business and the type of production machinery and equipment utilized in conducting its mining operations provide further contextual support for this construction.

[4]For example, if electronic data processing equipment was damaged and could be repaired with the exercise of diligence within a short period of time, it could hardly be said that the parties would have intended to permit the insured to elect to replace such property based on commercial reasonableness even though the length of time for which loss would ensue would be increased multi-fold. This point is particularly forceful because a comprehensive review of the Global All Risk Policy reveals that Section 12(B)(2) is the only provision in the policy where a provision for "cost to repair" appears.

Consideration of the pertinent aspects of the Global All Risk Policy as a whole clearly indicate that the parties intended the valuation formulas of cost to repair or replace new in Section 12(B)(2) to be alternatively applicable based upon the degree of destruction and the resulting circumstances. This intent is consistent with the well-settled meaning of the terms they employed within the insurance industry in general and Pennsylvania jurisprudence in particular. The parties carefully and clearly indicated those forms of property loss over which plaintiff would have the right to or option to elect replacement cost valuation and limited other variable components used in calculating loss when such an option was not expressly included. Consequently, the parties' intent to limit loss valuation to the costs of repair with regard to production machinery and equipment where it could be accomplished in accordance with the settled meaning of that term is readily apparent. Given this clear and unequivocal understanding reflected in the agreement, plaintiff's contention that the policy is ambiguous must be rejected and the policy must be construed in a manner that permits the cost to repair production machinery and equipment to act as a limitation on the cost to replace such machinery and equipment new where the circumstances so warrant.

Plaintiff's arguments to the contrary and references to purported extrinsic evidence in support thereof are unavailing. First, Section 12(B)(7) provides no support for plaintiff's position. It merely permits plaintiff to change the situs of any damaged property with the understanding that recovery under those circumstances will limited to the hypothetical cost to replace on the site where the property was damaged. The provision merely speaks to the ability of the insured to relocate property for which replacement coverage has otherwise been provided. It does not contain any language that reflects an intent to override the repair limitation the parties engrafted into valuation of reduction machinery or equipment; it merely extends to plaintiff the option of relocating property such as Stacker/Reclaimer No. 2 in the event the proper measure proves to be replacement cost. In other words, had plaintiff elected to relocate Stacker/Reclaimer No. 2 following its collapse on June 25, 2001, and ultimately prevails in its claim for

16

replacement costs, defendants could not deny plaintiff the cost to replace new that would have been incurred had it been replaced at the location where the June 25, 2001, accident occurred. The option of choosing a new location does not equate to the ability to elect replacement valuation where another form of valuation is called for under the policy.

Moreover, plaintiff's contention that any construction short of the one it advocates would convert the broad coverage it purchased into a policy that would always default to actual cash value on the date of the loss is without merit. Repair costs may well exceed the actual cash value on the date of the loss in any given setting and plaintiff would be entitled to those repair costs under the policy, provided of course that the property has been repaired. The same is true for replacement cost where repair is not an available option.

Furthermore, plaintiff's attempt to demonstrate ambiguity by reference to the subsequent policies that contain valuations based on the "lesser of" or "smaller of" repair, replacement or actual cash value is wide of the mark. In that setting, the parties may well have a dispute about whether any particular property is or was subject to repair, which in turn would provide a limitation on the other two valuation measures of replacement cost or actual cash value. Such a dispute would be synonymous with the one currently before the court and could not be resolved by application of the formula calling for the least costly measure. Thus, plaintiff's argument that including such language would have "put the matter beyond reasonable question" lacks probative force.

In light of the above, the court concludes that the parties intended the cost of repair or replace new to operate as limiting alternatives to be employed in a manner consistent with their well-understood meanings. Of course, the question of whether an attempted repair of Stacker/Reclaimer No. 2 would have restored the equipment to the same condition it was before the loss and made the production equipment as good and serviceable as it was before the loss is the central factual question to be resolved in determining liability and the concomitant measure of recoverable losses. The court will submit that question to the jury pursuant to a special

17

interrogatory.

The issue remains as to which party should bear the burden of proof on the question of repair. Plaintiff has pled a cause of action for replacement costs. It has alleged (1) that it entered into a policy of insurance with defendants; (2) the policy provided insurance coverage for various forms of property loss; (3) property loss occurred as a result of the happening of an occurrence during the term of the policy; (4) the property damage resulted in loss covered by the policy in the form of replacement costs; and (5) and plaintiff has incurred the costs of replacing the covered property. Thus, all of the conditions precedent to the replacement cost recovery plaintiff seeks are alleged in the complaint.[5] And plaintiff is prepared to prove that for all practical purposes the damage to Stacker/Reclaimer No. 2 made it a total loss.

Plaintiff having pled all necessary elements and conditions precedent to the recovery it seeks, and the policy having delegated to plaintiff the ability to control decisions about the actual disposition of damaged or destroyed property, and plaintiff having elected one option over the other, it is clear that it is defendants who seek to reduce or abate their liability based on a provision that can serve as a limitation on liability under the circumstance. In such situations the carrier bears the burden of proving the findings necessary to diminish or limit plaintiff's recovery. Keystone Paper Mills, Co., 139 A. at 629. The Supreme Court of Pennsylvania long ago explained:

---

[5]It generally is recognized that the significant condition precedent to replacement cost recovery is that the insured replace the property in question. See 2 Barry Ostrager & Thomas Newman, Handbook on Insurance Coverage Disputes, 13th ed. 2006 §21.06(d) ("Moreover, such policies invariably include as a condition precedent to a supplemental replacement cost recovery a requirement that the insured first complete restoration of its property.") (collecting cases in support); Maryland Casualty Co. v. Knight, 96 F.3d 1284, 1292 (9th Cir. 1996) (condition precedent to replacement cost recovery is the actual replacement of the lost or damaged property prior to the demand for payment of replacement costs); Pierce v. Farm Bureau Mutual Ins. Co., 548 N.W. 2d 551, 554 (Iowa 1996) ("The parties agree a condition precedent to recovery by the [insured] is that 'replacement' must be complete' under the replacement cost provision."). The Global All Risk Policy contains this restriction by indicating at the end of Section 12 that unless covered property has been repaired or replaced, the basis of adjustment shall be the actual cash value on the date of the loss.

> The provision in a policy that liability should not exceed
> the cost to an insured of replacing the property and all like
> subordinate provisions, limiting or abating the primary liability of
> the insurer, constitute no part of the insured's cause of action, if
> there is a breach of those stipulations. They are inserted in the
> policy for the benefit of the insurer, and they must be pled by the
> latter if it seeks to diminish or limit the amount of its recovery
> by reason thereof. This is the rule deduced from the authorities
> ... even as affecting the credibility of the witnesses, it is in the
> nature of a substantive defense ....

Id. (collecting cases in support). Because the instant policy likewise does not expressly

condition plaintiff's recovery of replacement costs on establishing the inability to repair the

property, and it is defendants who seek to diminish their liability through application of the

potentially subordinate provision of repair, defendants are properly charged with the burden of

proof on such a substantive defense.

In light of the above, the court will submit the following special interrogatory for the

jury's consideration with regard to the scope of defendants' liability:

> Do you find that an attempted repair of Stacker/Reclaimer No. 2 after its collapse
> on June 25, 2001, would have restored it to the same condition and made it
> substantially as good and serviceable as it was before the collapse?

The jury will be instructed in conjunction with this interrogatory that in answering this question

of fact they should consider whether a reasonable, informed business man in the mining industry

in question who was uninsured would have concluded that the proposed repairs to

Stacker/Reclaimer No.2 would have resorted the machine to the same condition of usefulness,

function and purpose it was in before the loss and to a condition that made it as good and as

serviceable as it was before the loss. This would include, among other considerations, whether

such an individual would conclude that the machine would be safe, insurable, meet the same

level of production, provide the same level of reliability, be maintainable with the same level of

service, not suffer any reduced life-expectancy or long-term reliability as a result of the repair,

and so forth.

Finally, the court believes that bifurcation of the above question of fact from the resulting

recoverable damages that will follow from its resolution is appropriate. Proceeding in that

19

manner will focus the jury's attention on the critical inquiry pertaining to the degree of liability. It will also assist the court and the parties by providing an orderly and focused manner in which to proceed. Once a determination is made on the scope of defendant's liability, the subsequent presentation of damages can be undertaken in a much more orderly and focused manner. Accordingly, bifurcation of the above question of fact from the issue of recoverable losses/damages is warranted.

An appropriate order reflecting the rulings and rational in support thereof set forth above will follow.

Date: June 7, 2007

David Stewart Cercone
United States District Judge

cc:    Robert W. Doty, Esquire
       Andrew M. Roman, Esquire
       Larry K. Elliott, Esquire
       David F. Russey, Esquire
       Cohen & Grigsby, P.C.
       11 Stanwix Street, 15th Floor
       Pittsburgh, PA 15222

       Paul K. Geer, Esquire
       Tara L. Maczuzak, Esquire
       DiBella, Geer, McAllister & Best
       312 Boulevard of the Allies
       3rd Floor
       Pittsburgh, PA 15222

       Thomas S. Gozdziak, Esquire
       James M. Hoey, Esquire
       CLAUSSEN MILLER, P.C.
       10 South LaSalle Street
       Chicago, IL 60603-1098