COMPAGNIE DES BAUXITES )
DE GUINEE, )
          )
            Plaintiff, )
          )
          v. )       **2:04cv393**
          )       **Electronic Filing**
THREE RIVERS INSURANCE )
COMPANY and UNION GUINEENNE )
D'ASSURANCES, )
          )
            Defendants. )

## OPINION

      Plaintiff commenced this action seeking to establish that defendants breached a global all risk insurance policy ("the policy") when they failed to pay in full a proof of claim plaintiff submitted for a large piece of mining production equipment known as Stacker/Reclaimer No. 2 following its collapse on June 25, 2001. After three years of pretrial development involving discovery on three continents, plaintiff's breach of contract claim was tried to a jury during a two-phase proceeding that lasted three weeks. The jury returned a verdict in plaintiff's favor. Presently before the court is plaintiff's motion for a new trial. For the reasons set forth below, the motion will be denied.

      The cornerstone of plaintiff's breach of contract claim was its contention that under the policy it was entitled to elect to "replace new" Stacker/Reclaimer No.2 and recover all attendant costs therewith as well as all attributable business interruption losses incurred during the time it took to replace the machine. Defendants maintained from the beginning that Stacker/Reclaimer No. 2 was capable of being repaired after the accident and consequently under the policy plaintiff's recovery was limited to those expenditures and attendant business interruption losses that would result from an immediate repair of the machine.

      Under the policy plaintiff retained the right to control the ultimate disposition of any property and decided to replace Stacker/Reclaimer No. 2. It tendered a claim for costs and losses

incurred pursuant to that decision. Defendants adjusted the claim based on what they contended was the cost of repair and losses associated therewith. The instant action followed.

Plaintiff's complaint sought damages incurred to date as well as any future losses attributable to the accident and recoverable under the policy. By the time of trial plaintiff's claimed damages had swelled to over $29,000,000.00. Defendants remained steadfast to their initial determination that all recoverable proceeds had been paid when it adjusted plaintiff's claim. The parties' pretrial preparation and motions practice were extensive. Prior to trial the court issued declaratory relief on the proper construction of the policy and rulings on a vast number of pretrial motions. Through a two-part determination, the jury resolved all factual disputes and rendered an award in plaintiff's favor in the amount of $270,084.00. The court molded the jury's verdict to include $68,695.86 in prejudgment interest and entered a final judgment in plaintiff's favor in the amount of $338,779.68. Plaintiff's motion for a new trial followed.

Plaintiff asserts a new trial is warranted because each of the jury's verdicts were against the great weight of the evidence, erroneous rulings were rendered on the admissibility of testimony by defendants' key expert witnesses, and the jury received improper instructions on several levels. Defendants maintain that plaintiff received a fair trial, which is all it was entitled to, and the record fails to contain any basis for granting a new trial.

The June 25, 2001, accident occurred in the Republic of Guinea, Africa. The Republic of Guinea owns 49% of the ownership interest of plaintiff, and Helco Mining, Inc., owns the remaining 51%. Helco Mining is owned by the world's major aluminum producers or their respective affiliates, including Alcoa, Inc., Alcan Aluminum, Ltd., Aluminum Pechiney, and Dadco Aluminum & Chemicals Ltd. Defendant Three Rivers Insurance Company is a captive insurance company owned by Alcoa. Union Guineene d'Assurances is a foreign business corporation organized and existing under the laws of France. The Republic of Guinea contains more than 40% of the world's bauxite reserves and plaintiff operates a large mining and bauxite

processing operation there. Plaintiff mines large quantities of wet bauxite ore and ships it by railroad to a processing facility at the Port of Kasmar. There, the wet ore is stored and/or sent through a drying process and ultimately loaded onto ships for delivery to the aforementioned producers of aluminum. Plaintiff utilizes two stacker/reclaimers as part of its operations at the port.

The parties hired various professionals and consultants to investigate the June 25, 2001, collapse of Stacker/Reclaimer No. 2 immediately after the accident. These companies/individuals attempted to assess the condition and degree of damage to the machine. Plaintiff hired world renowned experts in the fabrication and repair of large mining equipment and requested assessments on the repair or replacement of the machine. After considering these various assessments as well as a number of other business considerations, plaintiff elected to replace the machine. Stacker/Reclaimer No. 2 was thus dismantled and a new machine was erected in its place. As a result, plaintiff was without the use of the machine from the time of the accident through most of 2004.

The parties engaged in fact discovery from May of 2004 through September of 2006. By January of 2006 it became apparent that extensive expert discovery was also necessary. See e.g. Joint Motion to Amend (Doc. No 46). During the first half of 2006 the parties engaged in expert discovery while electing to move forward with the initial filing of their respective pretrial statements. See Order of January 10, 2006 (Doc. No. 50). On April 3, 2006, and May 3, 2006, the parties filed their initial pretrial statements and various exhibits in support. See Doc. Nos. 55-60. They agreed to amend their pretrial statements following the completion of expert discovery.

Disputes arose in the latter part of 2006 concerning whether each side properly had complied with the disclosure requirements governing the use of expert testimony at trial. See Plaintiff's Motion to Compel Depositions or to Exclude Expert Testimony of Phillip Staples and John Shires (Doc. No. 70) and Defendants' Motion in Limine to Limit Witness Testimony Based

Upon Late Disclosure (Doc. No. 76). On February 1, 2007, a Memorandum and Order was issued directing defendants to either (1) amended their pretrial statement to exclude Staples and Shires as designated expert witnesses or (2) permit their depositions to occur after service of a written report authored in compliance with Rule 26(a)(2)(B). See Memorandum and Order of February 1, 2007 (Doc. No. 154). The court indicated defendants' omnibus motion to limit plaintiff's designation of expert witnesses would be resolved in a like manner. A distinction was drawn between those witnesses whose testimony would be limited exclusively to historical actors and viewers of the underlying events and those who would seek to proffer opinions concerning matters beyond the witness's historical participation in the underlying events, thus triggering the reporting requirements of Rule 26(a)(2)(B). Id. at 6. Defendants elected to maintain Staples and Shires as expert witnesses and comply with the directives in the court's February 1, 2007, Memorandum and Order. See Notice of February 6, 2007 (Doc. No. 165). Plaintiffs elected to withdraw their counter designation of witnesses. See Plaintiff's Notice of Election (Doc. No. 166).

In January of 2007 Plaintiffs filed seven and Defendants filed sixteen motions *in limine*, a number of which sought to preclude the opposing parties' experts from testifying at trial. See Doc. Nos. 84-108. The parties submitted briefs and appendices in support and opposition to the motions. See Doc. Nos. 125-146. Reply briefs with supporting exhibits were filed. See 147-153, 155-164. Witness lists, designation of deposition excerpts, proposed jury instructions and other pretrial submissions followed. See Doc. Nos. 167-188.

Plaintiff renewed its Motion to Exclude the testimony of Staples after completing the additional expert discovery authorized by the February 1, 2007, Memorandum and Order. See Plaintiff's Motion *in Limine* No. 8 (Doc. 191). It likewise sought to preclude defendants' use of certain information contained in its own consultants' reports and proposals that were generated after the June 25, 2001, accident. See Plaintiff's Motion *in Limine* No. 9 (Doc. No. 193). Defendant filed an additional Motion *in Limine*. See Defendants' Motion *in Limine* No. 18 (Doc.

No. 194). The parties submitted additional briefs and documents in support of and opposition to

the additional motions as well as reply briefs. See Doc. Nos. 196-199, 201-203. They also

submitted amended jury instructions, designation of deposition excerpts and other pretrial

submissions. See Doc. Nos. 206-210, 217-222. Plaintiffs sought leave to file additional

motions *in limine*. See Plaintiff's Motion for Leave to File Additional Motion *in Limine* (Doc.

No. 223).

A memorandum on the scope of coverage and an order implementing declaratory relief

was issued on June 7, 2007, following a careful and comprehensive review of the parties' pretrial

submissions. See Memorandum on Scope of Coverage (Doc. No. 231) and Implementing Order

of June 7, 2007 (Doc. No. 232). After outlining the central issue underlying the parties' dispute

and each side's respective position in conjunction therewith, the court concluded:

> Consideration of parties' pretrial submissions as a whole make clear that
> declaratory relief is appropriate prior to trial. Accordingly, after consideration of
> all of the parties' submissions, all pertinent evidence in the record and the controlling
> and persuasive authorities on the matters at issue, the court concludes that (1) the
> insurance contract is clear and unambiguous; (2) defendants may pursue the defense
> of limiting liability to that portion of plaintiff's damages that would have been
> attributable to a successful repair of Stacker/Reclaimer No.2; (3) defendants bear the
> burden of proof and persuasion on this defense; and (4) bifurcation and submission
> of this defense to the trier of fact is appropriate prior to proceeding with evidence and
> factual determinations pertaining to the amount of plaintiff's damages.

Memorandum on Scope of Coverage (Doc. No. 231) at 2. The grounds for each of these

determinations, including an examination of the controlling and persuasive authority bearing on

each, was set forth in detail. Id. at 2-20.

More specifically, drawing on the settled meaning of the terms employed in the insurance

policy and the various valuation provisions therein as a whole, the court rejected plaintiff's

"attempt to contrive the various provisions of Section 12 [of the Global All Risk Policy] into a

state of ambiguity of its liking." Id. at 7. It drew on the long-settled and well-understood

meaning of the terms therein as used in the insurance industry in general and the Commonwealth

of Pennsylvania in particular to conclude that the language employed by the parties to provide for

the valuation of production equipment is clear and unambiguous. Id. In doing so the court

5

rejected plaintiff's proposed standard of "commercial reasonableness" as the appropriate yardstick for differentiating between plaintiff's entitlement to "the costs ... to replace new" and the alternative "costs to repair" because "the concept of commercial reasonableness appears neither in the insurance policy nor the long-standing authority informing the use of the terms and concepts the parties incorporated into the Global All Risk Policy." Id. at 13.

Having concluded the parties intended the valuation provisions of costs to repair or replace new to operate as limiting alternatives to be employed in a manner consistent with their well-understood meanings, the court explained that it would submit the question of whether "an attempted repair of Stacker/Reclaimer No. 2 would have restored the equipment to the same condition it was before the loss and made the production equipment as good and serviceable as it was before the loss" to the jury pursuant to a special interrogatory. It further opined that defendant properly was assigned the burden of proof on the question of repair. Id. at 17-18. The court reasoned the policy does not expressly condition plaintiff's recovery of replacement costs upon establishing the inability to repair the property and it was defendants who sought to diminish their liability through application of the potentially subordinate provision of repair. After setting forth both the specific interrogatory that would be submitted for the jury's consideration and supporting instructions that would be given to inform the jury's consideration of the posed question of fact, the court indicated that it would bifurcate the central issue of fact on the scope of defendant's liability from the resulting recoverable damages that would flow from its resolution. Id. at 19-20.

Commencing on June 8, 2007, and continuing through June 12, 2007, the Court entered memorandum orders on virtually all of the parties' pending motions *in limine*. See Doc. Nos. 233-247, 250-261. The motions were resolved in a manner consistent with the Court's rulings on the scope of coverage and it's implementing order. See e.g. Memorandum Order Granting in Part and Denying in Part Defendants' Motion *in Limine* No. 5 (Doc. 236) (granting motion to the extent it sought to exclude evidence that only was relevant to the question of whether it would

6

have been more commercially reasonable to elect replacement over repair under all the attendant circumstances, but denying it to the extent it sought to exclude evidence that had a bearing on whether a reasonable, informed business man in the mining industry in question who was uninsured would have concluded that the proposed repairs to Stacker/Reclaimer No. 2 would have restored the machine to the same condition and made it as good and serviceable as it was before the loss); Memorandum Order Granting in Part and Denying in Part Defendants' Motion *in Limine* No. 13 (Doc. No. 242) (granting motion to the extent plaintiff sought to introduce evidence to show the parties' intent with regard to the scope of coverage provided by the policy, but denying it to the extent it sought to bar evidence demonstrating defendants' past willingness to guarantee the success of a proposed repair and pay replacement costs if that repair were to prove unsuccessful under policies containing language providing for alternative repair or replacement coverage, and the lack of any such offer with regard to repairing to Stacker/Reclaimer No. 2, subject to plaintiff establishing a sufficient evidentiary foundation to support a preliminary finding of such a common course of dealing); Memorandum Order Granting in Part and Denying in Part Defendants' Motion *in Limine* No. 17 (Doc. No. 246) (granting motion to extent it sought to bar reference to or questioning about defendants having an actual right to repair Stacker/Reclaimer No. 2, but denying the motion to the extent it sought to preclude the introduction of evidence bearing on the quality, serviceability, reliability, safety, performance, insureability, life-expectancy, maintainability, or similar attribute of any proposed repair). Additional memorandum orders on other pending evidentiary matters were issued on June 13 and June 14, 2007. <u>See</u> Memorandum Order Denying Plaintiff's Motion in Limine No. 9 (Doc. No. 263) and Memorandum Order Denying Plaintiff's Motion to Strike Defendants' Designation of Deposition Testimony Without Prejudice (Doc. No. 268).

Jury selection began on June 13, 2007. Evidence was introduced over the next eight days for the jury's consideration of its phase one verdict on liability. The parties submitted supplemental jury instructions on June 22, 2007, and June 25, 2007. <u>See</u> Doc. No.s 276, 280.

On June 25, 2007, the following interrogatory was submitted to the jury:

> Do you find that an attempted repair of Stacker/Reclaimer No.2 after its collapse on June 25, 2001, would have restored it to the same condition and made it substantially as good and serviceable as it was before the accident?

Jury Verdict (on liability) (Doc. No. 296) at 1. Thorough instructions were provided to guide the jury in its resolution of the factual issues subsumed within phase one. See Transcript of Jury Charge given on June 25, 2007 (Doc. No. 310).

More specifically, after informing the jury of the standard procedural and evidentiary matters governing a civil trial, the court instructed the jury as follows:

> In this case the court has determined as a matter of law what the parties intended and expected when they entered into the contract of insurance underlying this case. They intended that cost recovery for both repair and replacement would be available as appropriate depending on the degree of damage to the production machinery or equipment in question following any particular covered accident. The parties dispute certain factual matters about the condition of Stacker/Reclaimer No. 2 after its collapse on June 25, 2001, and resolution of this dispute is necessary to a determination of the rights between the parties.

> Plaintiff brought this action after defendants failed to pay the costs plaintiff incurred in replacing Stacker/Reclaimer No. 2 following its collapse on June 25, 2001. Plaintiff maintains that such a recovery is appropriate because the machine essentially was a total loss and therefore could not be repaired as that term is used in the insurance policy. Defendants, in turn, contend that Stacker/Reclaimer No.2 could have been repaired within the meaning of the policy and as a result they seek to limit their liability on plaintiff's claim to a recovery that is consistent with what it would have cost to repair Stacker/Reclaimer No. 2 directly after the accident.

> The policy of insurance in question provided insurance coverage for the repair or replacement of damaged production machinery and equipment. And unlike the common way of handling insurance claims for damage to covered property with which you may be familiar, such as in a typical automobile insurance policy, the parties specifically agreed that defendants would not have any right to control the disposition of damaged property. In other words, under the policy defendants cannot insist that the machine be repaired or replaced. Instead, in general, the parties agreed that plaintiff would have the right to make the decision about whether damaged property should be repaired or replaced after a covered loss and defendants would be obligated to honor plaintiff's decision and pay the claim as presented in the absence of any affirmative defense.

> Plaintiff purchased replacement cost coverage under the policy. Replacement cost coverage is designed to provide added insurance coverage for the difference between actual cash value of property on the date of the loss and the cost to replace the property with new property as of that date. This coverage entitles plaintiff to recover the full cost of replacing the property at the time of the

loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value.   This means that when covered property is damaged, plaintiff may elect to replace the property and make a claim under the policy for the full cost of replacing the old property with new property, notwithstanding the age or general condition of the property.  It also means that defendants agreed to bear the risk that under appropriate circumstances they would have to pay for the replacement of  property at or near the end of its useful life with new property designed to perform the same operations.

In this case, the general requirements  necessary for plaintiff to present a replacement cost claim  under the insurance policy  are not in dispute.  An accident occurred while the insurance was in effect, there was a loss to insured property covered by the policy as a result of the accident, plaintiff timely gave defendants notice of the accident, investigation revealed that a substantial degree of damage occurred to the property as a result of the accident,  plaintiff elected one of the forms of coverage available under the policy  – to replace the damaged production equipment, and plaintiff completed the replacement of the machine.

In structuring the insurance contract  the parties agreed that plaintiff did not have to establish the damaged property could not be repaired as a prerequisite to obtaining replacement costs.  Because the insurance policy does not require plaintiff to prove the machine could not have been repaired as a condition for obtaining replacement cost coverage, plaintiff has made what the law recognizes as a prima facia, or  initial, claim for replacement cost coverage under the policy. And correspondingly, plaintiff has established a prima facia case of breach of the insurance contract subject to any affirmative defenses.   In other words, plaintiff has established all the prerequisites for its breach of contract claim for replacement cost coverage  and the burden shifts to defendants to prove by a preponderance of the evidence that Stacker/Reclaimer No.2 could have been repaired as that term is used in the insurance policy. Thus,  defendants must pay the claim  in accordance with the replacement cost coverage provided  by the policy, unless defendants can establish by a preponderance of the evidence that the property could have been repaired as that term was used in the policy.  This is what the law recognizes as an affirmative defense.

In light of the above, the interrogatory you are to answer to resolve this phase of the case asks the following question:

[question read]

There are several points that you must take into account in arriving at your answer to special interrogatory number one.

First is the definition of repair as used in the policy.  Now the term "repair" generally means to restore an item to sound condition after damage or injury.  As commonly used, the word "repair" means to fix by replacing or putting back together what is broken, or ... to bring back to good or usable condition.  And in this context the term denotes the act of  restoring the object's function and purpose, and not the  returning  of the object to its earlier monetary worth or value.   In other words, to repair the machine means  the act or the instance of restoring it to sound condition and putting in good and relative condition for its working use and functional purpose.

9

Second is the degree of restoration that would have to have been accomplished by a repair of the machine. Now, as a general matter almost any physical machine that is damaged can be restored to some operable condition if it has not been completely destroyed. However, that is not the standard in this case. The parties had a more specific understanding of what a repair would have to accomplish in order to comply with the terms of the policy. By using the term repair in this specific setting, the parties acknowledged that a repair of Stacker/Reclaimer No.2 would mean it could be restored to the same level of functional usefulness and practical utility it had before the accident from the perspective of a reasonable, informed business man in the mining industry whose objective was to be placed back to his pre-loss position if that could be done. This would mean that the restored machine would have at least the same capacities, capabilities, operational costs, and levels of reliability and safety, require no more than the same amount of maintenance and service, and not be diminished from its pre-loss condition in any meaningful way with regard to use, function and purpose. If the repair could not place such an individual back into a position at least equal to his pre-loss condition with regard to the machine's functional usefulness and practical utility, then such an individual would recognize that a new machine would have to be acquired.

So, in answering the special interrogatory, you are to consider whether a reasonable, informed business man in the mining industry in question who was uninsured would have concluded that the proposed repairs to Stacker/Reclaimer No.2 would have restored the machine to the same condition of usefulness, function and purpose it was in before the loss and to a condition that made it as good and as serviceable as it was before the loss. This would include, among other considerations, whether such an individual would conclude that the machine would be safe, insurable, meet the same level of production, provide the same level of reliability, be maintainable with the same level of service, not suffer any reduced life-expectancy or long-term reliability as a result of the repair, and any similar aspect of functional usefulness and practical utility that you find from the evidence would be important to such an individual.

Third, it is important to recognize that your factual determinations in answering special interrogatory number one do not involve and are not to be influenced by whether plaintiff made the best or a good business decision in deciding to replace Stacker/Reclaimer No. 2. Matters bearing on long-term investment strategies, the monetary value of equipment obtained for dollars spent, and general profitability are not relevant to the question of whether Stacker/Reclaimer No. 2 could have been repaired as that term was just explained.

Fourth, evidence reflecting any guaranties, warranties and assessments of safety that would or would not have accompanied the proposed repairs was admitted for the purpose of helping you evaluate whether the machine could be repaired after the accident as that term was just explained. You are not to consider these and other similar business concerns beyond the extent that you find they have a bearing on whether a repair would have brought about a successful restoration.

Finally, you should consider all of the evidence in the case to the extent you find it has a bearing on the factual determination of whether Stacker/Reclaimer No. 2 could have been successfully repaired as that term was

used by the parties in the insurance policy.

Transcript of June 25, 2007, the Court's Charge - Phase One (Doc. No. 310) at 25-32. After considering all of the evidence and the court's instructions as a whole, the jury answered Special Interrogatory No. 1 in the affirmative. See Doc. No. 296.

Phase two of the trial pertained to the damages plaintiff sustained due to the loss of Stacker/Reclaimer No. 2 during the period of time it would have taken to repair the machine successfully. Over the next six and one-half days the parties presented very divergent views on the importance of Stacker/Reclaimer No. 2 in plaintiff's day-to-day operations, the costs that would have been incurred had plaintiff elected to repair the machine, and whether its absence causally contributed to the business and other attendant losses claimed by plaintiff. Plaintiff sought to establish that Stacker/Reclaimer No. 2 was a critical component in its operations at the port and its absence was the central factor in its decrease in bauxite output for many months after the accident. Defendants introduced evidence supporting the views that Stacker/Reclaimer No. 2 was a secondary piece of machinery in plaintiff's port production, frequently plaintiff's operations were conducted in a manner that bypassed the stacking/reclaiming process and directly processed the wet bauxite for shipment, thereby permitting plaintiff to meet all of its stacking and reclaiming needs with the use of Stacker/Reclaimer No. 1, and the independent causes of a downturn in the alumina market and inconsistent and inadequate supply from plaintiff's mining operations were the causes of plaintiff's claimed shipping shortfalls.

The parties also vigorously disputed the costs plaintiff would have incurred had it elected to repair the machine. Plaintiff sought to establish that significant additional expenditures would have been incurred in refurbishing or replacing its various components. In addition, in its view significant additional testing would have been necessary in order to effectuate a repair as that term was used in the policy. Although Staples conceded on cross examination that he may have overlooked a few expenses in constructing his cost of repair estimate, defendants essentially contended that the vast majority if not all of the costs of a successful repair had been taken into

account in their adjustment of the loss.

At the close of phase two the jury was asked to answer the following special interrogatory:

> Do you find that defendants materially breached the insurance contract by failing to pay (1) the full amount due for what it would have cost to repair Stacker/Reclaimer No. 2 successfully after the accident and/or (2) the full amount due for any one or more of the covered areas of losses and expenses that were incurred by plaintiff during the period of time it would have taken to repair Stacker/Reclaimer No. 2 successfully after the June 25, 2001, accident?

The jury answered this interrogatory in the affirmative and awarded plaintiff damages. See Jury Verdict on Damages (Doc. No. 297). Pursuant to the court's ruling on plaintiff's motion to sever the issue of pre-judgment interest, the court molded the jury's award to include pre-judgment interest. See Order of July 12, 2007 (Doc. No. 298). Judgment was then entered in favor of plaintiff and against defendants. See Final Judgment Order of July 12, 2007 (Doc. No. 300).

Plaintiff asserts numerous grounds in support of a new trial. It contends both the phase one and phase two verdicts were against the weight of the evidence, the court made substantial errors in admitting expert testimony from each of defendants' key experts and the jury received erroneous instructions on (1) the issue of whether repair or replacement was the correct measure of loss, (2) the party having the burden of proof in establishing plaintiff's damages and (3) whether the policy placed a duty on plaintiff to mitigate its claimed damages. Defendants maintain the record fails to contain any basis for a new trial.

The decision to grant a new trial rests with the trial court's discretion. Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted "to all or any of the parties and on all or part of the issues ... in an action where there has been trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). A trial court's discretion to grant a new trial on the basis of improperly admitted or excluded evidence, rulings regarding points for charge, misconduct of counsel or newly discovered evidence is quite broad. Link v. Mercedes-Benz of N.A., Inc., 788 F.2d 918, 921-22 (3d Cir. 1986). Where, however, the motion is made on the basis that the

verdict is against the clear weight of the evidence, the granting of the motion is proper only if the jury's verdict is "a miscarriage of justice" or "cries out to be overturned or shocks [the judicial] conscience." Williamson v. Conrail, 926 F.2d 1344, 1353 (3d Cir. 1991); see also Lind v. Schenley Industries, Inc., 278 F.2d 79, 88-89 (3d Cir.), cert. denied, 364 U.S. 935 (1960); Griffiths v. SIGNA Corp., 857 F. Supp. 399, 411 (E.D. Pa. 1994), aff'd, 60 F.3d 814 (3d. Cir. 1995). This is particularly true where the issues raised are those which are well within the comprehension of jurors. Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d. Cir. 1993). Where the weight of the evidence must be considered in assessing the motion, the court is obligated by the Seventh Amendment to give deference to the jury's assessment of the evidence and may not substitute its judgment for that of the jury simply because the court might have reached a different conclusion. Williamson, 926 F.2d at 1348 & 1352; Griffiths, 857 F. Supp. at 411. Likewise, disputes which turn on the credibility of witnesses generally do not warrant a new trial. Id.

Plaintiff's contention that the jury's verdicts are against the weight of the evidence is misplaced. As more thoroughly explained in the resolution of plaintiff's motion for judgment as a matter of law, the record contained more than ample evidence to justify the jury's factual determination that a successful repair of Stacker/Reclaimer No. 2 could have been accomplished. The jury was instructed that plaintiff was entitled to replacement coverage unless defendants proved by a preponderance of the evidence that the machine could have been successfully repaired. And contrary to plaintiff's unfounded assertion, the jury specifically was instructed that merely restoring the machine to some operable condition was not sufficient. Instead, the jury was instructed to determine whether "a reasonable, informed business man in the mining industry in question who was uninsured would have concluded that the proposed repairs to Stacker/Reclaimer no. 2 would have restored the machine to the same condition of usefulness, function and purpose it was in before the loss and to a condition that made it as good and as serviceable as it was before the loss [and] this would include, among other considerations,

whether such an individual would conclude that the machine would be safe, insurable, meet the same level of production, provide the same level of reliability, be maintainable with the same level of service, not suffer any reduced life-expectancy or long-termed reliability as the result of the repair and any similar aspect of functional usefulness and practical utility that you [the jury] find from the evidence would be important to such an individual." And as the court set forth in sufficient detail in its accompany memorandum on plaintiff's renewed motion for judgment as a matter of law, the record contained more than sufficient evidence to support the jury's consideration of these matters. Consequently, it cannot be reasonably concluded that a miscarriage of justice would result if the jury's verdict were left to stand and therefore plaintiff is not entitled to a new trial on this ground. See Williamson, 926 F.2d at 1348; Shanno v. Magee Indus. Enters., Inc., 856 F.2d 562, 567 (3d.Cir. 1988).

Plaintiff's contention with regard to the jury's phase two verdict suffers from similar shortcomings. Whether defendants properly adjusted plaintiff's proof of claim to compensate for all expenses that would have been incurred upon a successful repair was a question of fact grounded in a straightforward breach of contract claim. And while plaintiff sought to highlight the importance of Stacker/Reclaimer No. 2 in its operations, defendants produced a plethora of evidence suggesting the machine had only a secondary role in plaintiff's ability to process bauxite and load it for shipment. Defendants presented substantial evidence suggesting during much of the time (including the time in question) the plant operated in a manner that bypassed the use of the stacking and reclaiming process and sent the bauxite arriving from the mines directly to the dryers for processing. In addition, defendants introduced substantial evidence supporting the view that other factors contributed to plaintiff's level of production during the period of recovery, including a downturn for aluminum in the global market, difficulties suffered by plaintiff in maintaining a steady supply of bauxite from its mining operations and other operational disruptions or shortcomings that were unrelated to the absence of Stacker/Reclaimer No. 2.

14

Moreover, plaintiff's own internal records failed to attribute and/or indicate that delays in processing, increased demurrage charges and various shortcomings in/with plaintiff's anticipated level of production were caused by the unavailability of Stacker/Reclaimer No. 2. To the contrary, the records frequently identified other independent causes, which causes were consistent with and/or similar to those highlighted by defendants.

There was also ample evidence to support the jury's determination that plaintiff was entitled to an additional amount to make it whole for the costs of a successful repair. Defendant's expert on the topic, Staples, admitted that he may have overlooked some of the costs that would have been incurred had plaintiff elected to repair the machine. This included the costs of additional cement, the possibility of the additional testing and reinforcement, and the discovery of additional damage to various component parts upon further inspection during the dismantling processing. The costs of these various aspects of a successful repair were sharply disputed and each side submitted and/or highlighted evidence bearing on these additional costs. At base, the determination was a straightforward question of fact and the jury resolved the question in plaintiff's favor. It is only the amount that is not to plaintiff's liking. Of course, the jury was not obligated to credit verbatim how either side quantified these additional costs/variables. To the contrary, it was entitled to reach its own factual determinations about such matters within the perimeters of the court's instructions. It did so and because there was ample evidence in the record to support the jury's factual determinations on damages, the granting of a new trial is not necessary to avoid a miscarriage of justice. Compare Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3d. Cir. 1988) (upholding trial court's grant of new trial where record contained overwhelming evidence undermining the jury's factual determination and highlighting the extraordinary number of inferences that the jury must have drawn in order to reach it's verdict, which when considered as a whole made the verdict border on mere speculation); Fireman's Fund Ins. Co., v. Aalco Recking Co., Inc., 466 F.2d 179, 187-88 (3d. Cir. 1972) (where the evidence is such that reasonable individuals may differ as to the result, the

determination properly is reserved for the jury. And where there is no significant weight-factor favoring the moving party, the granting of a new trial is unwarranted), cert. denied, 410 U.S. 930 (1973).

Plaintiff's challenges to the admission of the testimony by four of defendants' expert witnesses equally is unavailing. First, plaintiff's general challenges to the procedures employed to fulfill the court's "gatekeeper" function misconstrues the applicable precedent and distorts and otherwise ignores the record considered by the court when the rulings on admissibility were rendered.

There is no talismanic formula that must be followed when considering a Daubert challenge to the admission of expert testimony. Where the record contains submissions that provide the court with the ability to make a meaningful evidentiary determination, the court is not required to conduct a hearing before ruling on a Daubert challenge. Oddi v. Ford Motor Co., 234 F.3d 136, 153-54 (3d Cir. 2000). Such an approach "is consistent with Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d. Cir. 1999) and perfectly appropriate under Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999)." Id. In other words, the trial court enjoys wide latitude in deciding how to test and evaluate an expert's qualifications, reliability and the fit of the expert's conclusions in fulfilling its gatekeeping functions. Id. at 154.

Against this backdrop plaintiff's assertion that hearings were required before each proposed witness could testify is without precedential support. It is well settled that a party is not entitled to "an open-ended and never-ending opportunity" to mount a Daubert challenge until the party obtains a favorable ruling. Id. (citing In re TMI Litigation, 191 F.3d 158, 159 (3d. Cir. 2000).

Furthermore, plaintiff's general assertion that the admissibility of each challenge's expert's testimony "turned on factual issues" and the court failed to make any factual findings confuses the difference between a truncated record that does not sufficiently explain and explicate the "good grounds" for admitting an expert's opinions and one that does. To be sure, a

cautionary approach affording an evidentiary hearing and further development of any factual issues which may render the testimony admissible is particularly appropriate where a court is evaluating the admissibility of expert testimony in connection with a pending summary judgment motion which will become successful with the exclusion of the expert testimony. <u>Padillas</u>, 186 F.3d at 418 (quoting <u>Cortes-Irizarry v. Corporacion Insular De Seguros</u>, 111 F.3d 184, 188 (1st Cir. 1997)). But the court was not confronted with such a scenario. To the contrary, the record before the court adequately supported the admissibility of the challenged experts' testimony when the rulings were made shortly before trial and when each witness testified.

Consideration of the defendants' submissions in response to each of plaintiff's pretrial motions *in limine* demonstrated that admission of each expert's testimony was entirely appropriate. In fact, notwithstanding plaintiff's protestations, it would have been an abuse of discretion to exclude any of the challenged testimony. That each challenged expert's testimony prejudiced plaintiff's case by offering different opinions on the ability to repair Stacker/Reclaimer No. 2 or other potential causes for various aspects of plaintiff's claimed shortfalls is not a proper basis for excluding such testimony.

Plaintiff's wholesale attack on the admission of Mr. Moison's testimony is unfounded. Mr. Moison was an economist with more than twenty-five years of experience in dealing with markets for industrial metals, including bauxite, alumina and aluminum. His work experience included work with the U.S. Division of Pechiney Aluminum, which at the time was one of the world's leading producers of aluminum products. He has provided a broad array of consulting services to producers of primary aluminum, suppliers of goods and services to primary aluminum producers, users of aluminum and government agencies. His clients have included six of the eight owners of Halco Mining. He was more than qualified to render expert testimony on the bauxite marketplace, how demand for bauxite is derived, and the various factors that influence economic demand for bauxite, including logistical considerations, government regulations, refinery experience and existing capacity, and the terms of a refinery's agreements with its

bauxite suppliers. He was also more than qualified to render opinions on the impact the global market had on plaintiff's levels of production in the years 1999 through 2004 and three of its owners' decisions to request and plaintiff's decision to enter into deferral agreements in 2001.

Moison's methodology was sufficiently reliable. Sources he utilized for his report included the Bauxite and Alumina chapter from various minerals yearbooks prepared by the U.S. Geological Survey and other government agencies; international trade statistics compiled by the U.S. Census Bureau and other governmental agencies; United Nations Statistics Division - Commodity Trade Statistics Database; Australian Aluminum Council; the Encyclopedia Britannica; International Aluminum Institute; O'Carroll Aluminum Bulletin; and press releases from plaintiff's owners/customers. He analyzed key developments in the global alumina market beginning in 1999 and continuing through 2005. He used widely-recognized and well-respected bulletins and journals with sources independent of plaintiff and its owners to examine spot alumina prices in the market and other pertinent data about the market and its various sectors. He examined plaintiff's shipment history in conjunction with conditions and resulting trends in the global market during each of the years in question. He examined plaintiff's customer base, conditions at their refineries that influenced bauxite demand, their need and demand for bauxite and other matters affecting their receipt of bauxite.

Mr. Moison's expert testimony was founded on a reliable basis and his expert testimony and opinions had a clear fit with his analitical approach. Furthermore, his assessments clearly assisted the jury in understanding the factual issues underlying plaintiff's claim for business interruption loss. It was Moison's opinion that the shipping shortfalls for which plaintiff was seeking compensation in the form of business interruption loss were caused largely or entirely by factors other than the inability to use Stacker/Reclaimer No. 2 between mid-2001 and late 2004.

From Moison's perspective conditions in the global market for alumina contributed to plaintiff's decreased levels of shipment in 2001 and 2002 and led to the deferral agreements plaintiff made with three of its key customers. He examined plaintiff's shipments for two and

one-half years prior to the date of loss and for three years thereafter, which thus covered the pre-loss period, the period of recovery and the post-recovery period of production. He took into account and considered plaintiff's claim that it agreed to certain large deferrals because it could not achieve its shipping targets at that time. Based on (1) his twenty-five years of experience in the market, (2) appropriate publications and sources used by economists and professionals in the industry, and (3) information contained within plaintiff's own business records, he rendered opinions that were consistent with plaintiff's Board of Directors management meeting minute from December 5, 2002: "the company shipped less than projected because of a reduction of customer demand." And he considered the nature of the contractual commitments of plaintiff's owners and determined that notwithstanding those commitments, the absence of Stacker/Reclaimer No. 2 had no impact on plaintiff's claimed shipment shortfalls.

Plaintiff was free to and did attempt to undermine Moison's credentials, methodology and conclusions concerning the causes of plaintiff's claimed shortfalls. In the end, the jury properly weighed all of the evidence and presumably found plaintiff's evidence concerning its claimed business interruption losses wanting in sufficient probative force.[1]

Plaintiff's challenge to the admission of Ryan Sharp's testimony likewise is unavailing. The court thoroughly considered the various sources of information Sharp considered in formulating his opinions and analysis of whether the machine could be repaired. His opinions were based upon an independent analysis of all information generated from the investigating

---

[1]Plaintiff's assertion that the court failed to apply the appropriate principles in considering plaintiff's objection to Moison's testimony at trial is misplaced. Plaintiff fails to acknowledge that there is a legitimate distinction between the scope of questioning at a Rule 104 hearing and the proper *voir dire* of an expert in the presence of a jury. While economics and the application of economic principles in the marketplace is a well recognized and legitimate discipline, it is not a true form of science. It essentially is a discipline grounded in the principles of human behavior as they relate to the distribution of wealth. Moreover, the court clearly took into account the relevant principles under <u>Daubert</u> and the appellate court's guidelines in conjunction therewith in rendering its ruling on Moison's testimony. Plaintiff's virtually bald assertion to the contrary is based on an isolated statement taken out of context and divorced from the entire record.

entities as well as the repair estimates and accompany information from plaintiff's and defendants' consultants. His central opinion was that the machine could be restored to its preloss condition. And plaintiff was well aware that defendants maintained from the beginning that the machine could have been repaired and that the costs of repair was the appropriate valuation for adjusting plaintiff's proof of claim. Plaintiff's attempt to claim undue prejudice from Sharp's actual trial testimony thus rings hollow.

As defendant's response to plaintiff's motion *in limine* No. 2 appropriately demonstrated, Sharp had a degree in mechanical engineering with a minor in civil engineering and fifteen years of experience in dealing with mining equipment. His specialty was in mechanical/structural/fatigue failure analysis and large mining equipment maintenance support. He had acted as a consultant for two separate projects involving the determination of repair or replacement options for bucketwheel excavators. He had also worked on projects similar to the situation facing plaintiff after the June 25, 2001, collapse and had made assessments regarding damage to large production machinery used in the mining industry.

Morever, Sharp did perform an independent analysis. Sharp consulted a multitude of sources and information in formulating his opinion that Stacker/Reclaimer No. 2 could be repaired. He considered the information generated from plaintiff's hiring of the three premier world-class competitors in designing, manufacturing and repairing stacker/reclaimers. He considered the deposition testimony of a number of individuals, including Staples of Conveyor Kit, Horst Haefner and Arndt Kasper of Koch, Joseph Scheid, Joachim Kofferath and Horst Birheuer of Krupp and Peter Walker and Robert Authur Wells of Svedala. He read various reports and supporting estimates from each of the consultants. He reviewed numerous photographs taken by plaintiff and the individual entities that investigated the accident. He reviewed his own company's database for information on similar projects. He reviewed plaintiff's internal documents and relied upon them in making his assessment. He sought to review and verify independently each of the findings and conclusions of the various consultants

and world-renowned experts who/that investigated the accident and gathered pertinent information bearing on the decision of repair or replacement confronting plaintiff. And he approached his independent assessment based upon the principles of engineering, remaining useful life in components that were unstressed or suffered only tolerable levels of stress and information bearing on the potential for possible hidden damage.

Based on the numerous reports, detailed information and lengthy deposition testimony concerning the damage and the potential ability to repair Stacker/Reclaimer No. 2 to its pre-loss condition, Sharp's opinions cannot logically be viewed as passing on the credibility of other witnesses. To the contrary, it is quite clear that Sharp offered his own independent analysis on the issue of whether Stacker/Reclaimer No. 2 was repairable after the accident, the central issue raised by defendants from the beginning and decided by the jury in phase one. Excluding his engineering analysis on whether the various consultants' inspections, analysis, and cost estimates comported with reasonable engineering practices would have been an abuse of discretion and deprived the jury of relevant and helpful information bearing on the factual inquiries at hand. Consequently, the court did not error in denying plaintiff's attempts to exclude his testimony.

Plaintiff's attempt to attack the admission of Staples' testimony also is misplaced. Staples is a professional engineer with twenty-five years of experience in the bulk materials-handling industry. He is a mechanical engineer by training and an expert on forces and loads that would be involved with large bulk material-handling equipment and accidents involving such equipment. Staples had ten years of experience in designing stacker/reclaimer systems, including engineering experience in building "from beginning to end" over seventeen such systems, including design, design engineering, cost estimating, inspections, on site erection and/or the commissioning of such systems. He has intimate knowledge concerning the component parts of such systems and how those parts and/or components systems interact with each other. Staples has performed thousands of professional cost estimates involving mining equipment during the course of his professional career. He was thus more than adequately qualified to render the

assessments and opinions he offered at trial.

Moreover, Staples inspected the machine with the assistance of a component list, took photographs of it and requested additional information from plaintiff. He checked with local contractors for pricing and utilized established working relationships and contacts with various local contractors that he had developed as part of his business in South Africa. His methods of inspection were consistent with those used by the consultants plaintiff had hired, and he allotted for additional repairs that would be necessitated by testing for and the detection of hidden damage. He allotted for replacement where there was an indication of significant damage or a question as to whether parts could be reused. He included upgrades to the electrical and control systems. Both his methodology and approach were quite consistent with all other consultants who undertook similar assessments.

Furthermore, the fact that Staples incorrectly assessed the likelihood of being able to use the "slew ring" and/or did not have hard back-up data for each component of his cost estimate did not render his methodology unreliable. Staples produced an affidavit on May 8, 2007, indicating he had produced all of the materials in his possession. Plaintiff sought no further pretrial relief and simply chose to attack Staple's opinions and cost estimates based on the inferences the jury was free to draw about how some of his calculations were performed and the rate information and estimates he used had been obtained. Staples testified that he followed his normal practice for inputting rates and estimates, that is, he obtained the information from contractors directly and transferred it into a spread sheet. Plaintiff was free to counter those practices and the estimates generated therefrom by producing its own independent information on costs estimates and rates, and in fact did so with regard to certain large components of the machine, such as the "slew ring" and the gear box. Plaintiff had two opportunities to flesh out all of the areas where Staples simply used estimates of hours, rates or calculations for different types of design, fabrication, machine work, quality control, oversight and replacement parts. It had years to develop its own comparable information and prepare it for submission at trial. It had the

ability to highlight any perceived shortcoming in Staple's methodology in gathering cost information to the trier of fact. In the end, the jury agree with plaintiff's assessment that he had underestimated the total cost of a successful repair; it simply was not persuaded that Staples underestimated the cost estimate by at least a million dollars as argued by plaintiff's counsel during closing.

The record demonstrated Staples was sufficiently qualified to offer his opinions on the cost of repairing Stacker/Reclaimer No. 2. It likewise demonstrated that the methods he used to gather the information were sufficiently reliable to clear the gateway for admissibility. And the record adequately reflected that he had produced all available back-up material utilized in formulating his repair cost estimate and plaintiff was not unduly prejudiced by those areas where the approach utilized by Staples did not result in specific documentation backing up a particular rate or cost. Those matters were committed to the jury's credibility assessment of Staple's undertakings and resulting testimony, and the jury ultimately resolved all such issues of credibility in rendering its verdict. It cannot be said that the admission of Staple's testimony was in error or otherwise unduly prejudicial.

Plaintiff's wholesale attack on the admission of Lee Miller's expert testimony also is wide of the mark. Miller is a senior mining engineer with over twenty-five years of experience in the mining industry. He has worked extensively with material-handling systems and projects involving bulk-handling issues and related material-handling equipment, such as conveyors, shovels, front-end loaders, trucks, loading and transport by railroad cars, and so forth. These projects frequently involved coal or related waste materials, but such materials often had similar density, properties and characteristics with bauxite. He thus has sufficient experience in the area of bulk material-handling at large operations such as plaintiff's operations at the Port of Kasmar.

Miller was qualified to offer an opinion based on his analysis of plaintiff's claimed decreases in dispatch and increases in demurrage. At their base, demurrage and dispatch are simple mathematical calculations associated with the loading of a vessel within a specified

period of time.  At issue with regard to those calculations was whether the absence of Stacker/Reclaimer No. 2 had any impact on plaintiff's levels of production during the period of recovery.

Plaintiff's contention that Miller's methodology was unreliable because he had no information on plaintiff's mining operations ignores the substantial forces and body of information Miller took into account in formulating his opinions.  Plaintiff's business interruption loss was based on a measure that plaintiff characterized as "lost tonnage."  The calculations underlying this loss were based on the difference between the planned and actual shipment during the period of loss.  Plaintiff also sought damages for the increased demurrage which it experienced in each year from 2001 through 2004.  Plaintiff's expert, Andrew Zador, looked at the issues of "lost tonnage" and "increased demurrage" in formulating his opinions, which were centered around the proposition that the absence of Stacker/Reclaimer No. 2 was responsible for all of the shortfalls in production and increases in ship-loading time experienced by plaintiff after the accident.  Miller looked at the same issues as part of his analysis and merely reached a different conclusion as to the causes for those shortfalls in plaintiff's performance.  Of course, the court's "gatekeeping" functions are not a mere mechanism to elevate one party's view of the evidence over the other's or to give a particular party a tactical evidentiary advantage.

Miller's methodology was sufficiently reliable.  In conducting his analysis Miller analyzed and considered data and information from plaintiff's port operations; the process circuits at the port for production of crushed and dried bauxite, the variable routes that the bauxite could have traveled from rail car arrival to the shiploader; the routes and tonnage of bauxite which plaintiff directed through the port before and after the accident; stacker/reclaimer configurations and their roles in the port and modes of operation; plaintiff's performance at the Kasmar Port for years 1995 to 2004 as they related to crushed bauxite, changes in stockpiles and amount of bauxite shipped; actual shipments from the port in 1996 through 2004; plaintiff's shipping performance in 2000, it's historical shipping performance and the use of plaintiff's 2000

performance as a standard for measuring lost production during the period of loss; plaintiff's performance of planned shipments in the years 1996 through 2004, and the impact of customer deferral on required shipment tonnages; shipment shortfalls experienced by plaintiff during the absence of Stacker/Reclaimer No 2; shortfalls in wet bauxite deliveries to the port and their impact on shipments; plaintiff's managers' reports identifying causes for experienced shipment shortfalls; plaintiff's ability to attain record shipping levels in 2004 before Stacker/Reclaimer No.2 was returned to operation; the role and impact of a stacker/reclaimer in plaintiff's operations; the calculation of dispatch and demurrage; historical dispatch and demurrage performance at the port; factors that influenced dispatch and demurrage in the years 2000 through 2004; factors impacting demurrage and dispatch on a monthly basis during July of 2001 and December 2004; alternative operations implemented and temporary facilities installed by plaintiff to mitigate the impact the absence of Stacker/Reclaimer No. 2 had in stacking and reclaiming; and the analysis conducted by plaintiff's corresponding expert, Andrew Zador.

As the above makes clear, Miller had more than sufficient data and information to conduct his analysis of the impact the absence of stacker/reclaimer no. 2 had on plaintiff's claimed shipping shortfalls and dispatch/demurrage losses. There was more than an ample basis in his report to support his conclusions that the amount of wet bauxite arriving from the mines primarily was responsible for plaintiff's production shortfalls.

Finally, plaintiff's contentions that Miller's opinions did not "fit" the case and constituted a erroneous damage theory inappropriately seek to circumscribe the fact-finder's consideration of all of evidence. Miller had sufficient data and information to evaluate plaintiff's ability to get bauxite to the port and the impact the amount of bauxite delivered to the port had on plaintiff's shipping performance during the period of loss as compared to plaintiff's base year and its historical operations preceding this stellar year of production. Furthermore, he used the appropriate values from plaintiff's claimed probable level of production for each of the years 2001 through 2003, and the amount of dispatch plaintiff experienced in 2002. His opinion on the

impact the absence of Stacker/Reclaimer No. 2 had on shipping performance and demurrage were based on what plaintiff projected as its probable experience, 12.7 MTPA, and the level of dispatch in 2000, and actual causes for plaintiff's inability to meet those levels during the period of recovery. In concluding that plaintiff's claimed "lost tonnage" and "increased demurrage" were not the result of the absence of Stacker/Reclaimer No. 2, Miller essentially concluded that plaintiff would have experienced the same shipping performance with or without Stacker/Reclaimer No. 2 and the changes in plaintiff's operation which its absence brought about. Plaintiff's protestations to the contrary were appropriate matters for cross examination, not the exclusion of his testimony.

Plaintiff's arguments concerning its proposed use of evidence of custom, practice and usage in the insurance industry are disingenuous. The court thoroughly instructed the jury about plaintiff's entitlement to replacement cost coverage and defendant's burden to prove by a preponderance that a repair would have been successful as that term was used in the insurance industry and had been used by the parties. The jury was charged with deciding the essential facts necessary to resolve plaintiff's breach of contract claim. Interjecting irrelevant and confusing matters pertaining to business practices and judgments that were beyond the factual determinations necessary to resolve the parties' obligations and duties under the policy would at the very least have been inappropriate and unduly prejudicial to both parties.

Moreover, the court considered Professor Abraham's opinions in rendering its memorandum and implementing order on the scope of coverage. And it explained thoroughly why plaintiff's proposed "commercial reasonableness" standard was not applicable. Plaintiff has advanced nothing beyond dogmatic rhetoric to establish that the court's rulings were in error.[2]

---

[2]Even assuming the admission of Professor Abraham's opinion concerning custom, practice and usage in the insurance industry were somehow relevant to the factual determinations to be made by the jury, plaintiff waived any right to complain about the exclusion of this evidence. Plaintiff did not seek to proffer such evidence in phase one of the trial, and it failed to object to the court's phase one jury instructions in a manner that would have preserved its right to claim such an error.

Similarly, plaintiff's argument that the policy is ambiguous because it failed to contain a provision for electing one measure of valuation over the other is without force. Plaintiff, as a sophisticated insured who negotiated the policy through its own broker, elected to retain the unfettered right to make any decisions regarding the repair or replacement of mining production equipment. What it did not obtain in negotiating the policy was an unfettered right to the valuation of replacement cost new for any covered loss to such equipment, which it had obtained with regard to many other categories of covered property. And as the court emphasized in its memorandum on the scope of coverage, inserting a provision that would reduce the valuation to the lesser or smaller of the cost of repair or replacement new would not have eliminated the parties' instant dispute, which was grounded in a basic and fundamental dispute involving questions of fact.

Plaintiff failed to raise in any meaningful manner a number of the objections it now presses as to the court's jury instructions. As to those areas where it did raise objection, plaintiff failed to advance specific alternative instructions that were based on the record as developed at trial and that would provide meaningful guidance for the jury on the factual issues submitted for its consideration. Consequently, many if not all of plaintiff's challenges to the court's jury instructions have been waived. Those that were not are without merit.

In order to obtain a new trial based upon erroneous jury instructions, a movant must demonstrate (1) the alleged error specifically was raised and preserved in accordance with Rule 51, see Dunn v. Hovic, 1 F.3d 1371, 1378 (3d. Cir. 1993), and (2) the jury instruction as read as a whole and viewed in the light of the evidence failed to submit fairly and adequately the issues of fact to the jury. Link, 788 F.2d at 922 (relief from alleged error in charge is appropriate only where charge, taken as a whole and viewed with regard to the evidence adduced at trial, failed to submit adequately and fairly the issues to the jury and was capable of confusing and misleading the jury); Levenson v. Prentice-Hall, Inc., 868 F.2d 558, 564 (3d. Cir. 1989) (relief appropriate where charge as a whole failed to instruct the jury of the fundamental principles needed to guide

its consideration on punitive damages).

It has long been settled that in order to advance a post-trial claim of error based on an erroneous jury instruction, the movant must have made a timely and specific objection prior to the submission of the cause to the jury. See Don Kemper Co. v. Beneficial Life Ins. Co., 425 F.2d 221, 222 & n 4 (3d. Cir. 1970). This requirement is embodied in Rule 51, which provides in pertinent part:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider it's verdict, stating distinctly the manner objected to and the grounds of the objections.

Fed. R. Civ. P. 51. Compliance with the rule requires objections to be distinct and specific. See Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 139 n. 22 (3d. Cir. 1973) (Raising an objection based upon one ground is not sufficient to preserve the right to claim error based upon another.) The salutary purpose of these requirements "is to 'afford the trial judge the opportunity to correct the error [in the] charge before the jury retires to consider it's verdict' ...." Dunn, 1 F.3d at 1379 (quoting McAdam v. Dean Winter Reynolds, Inc.. 896 F.2d 750, 769 n. 29 (3d. Cir. 1990)).

Compliance with Rule 51 is not to be assumed. Smith v. Borough of Wilkinsburg, 147 F.3d 272,276 (3d. Cir. 1998). To the contrary, a party claiming error under Rule 51 has the burden of demonstrating the objection raised post-trial was distinctly raised and the grounds of the objection were specifically made known at a point in time that would have permitted corrective measures to have been timely implemented. Id. Otherwise, the court's post-trial review of jury instructions is for plain error. Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 135 (3d. Cir. 1997).

Plaintiff's contention that the court's phase one instructions inappropriately eliminated all considerations of cost or value and permitted the defendants to meet their burden by merely demonstrating it was theoretically possible to repair Stacker/Reclaimer No. 2 ignores virtually all of the Court's substantive jury instructions in phase one. The instructions as a whole clearly advised the jury of plaintiff's right to replacement coverage as opposed to repair, and the quality

of repair that would have been necessary in order to limit the recovery to that measure of valuation.  The jury was instructed to consider and determine whether a repair would have fulfilled numerous attributes that a reasonable business man in the mining industry would recognize as important in restoring the machine to the same condition of usefulness, function and purpose that it was in before the loss and to a condition that made it as good and as serviceable as it was when it was operating.  This included, among other things, whether a reasonable, informed business man in the mining industry in question would have concluded that the machine would be safe, insurable, meet the same level of production, provide the same level of reliability, be maintainable with the same level of service, not suffer any reduced life expectancy or long-term reliability as a result of the repair and any similar aspects of functional usefulness and practical utility that the evidence demonstrated would be important to such an individual.  Such considerations required the jury to find as a matter of fact that the repair would have encompassed numerous attributes of functional utility and purpose bearing on consideration of cost and value, and compelled the jury's determination to be far above  a nonsensical conclusion that the cost of repair would always be the proper measure of recovery.

Similarly, plaintiff's contention that it inappropriately bore the burden of proving the damages flowing from defendant's adjustment of plaintiff's proof of claim fails to account for the basic principles governing a breach of contract claim.  Defendants having properly determined that plaintiff's claim of loss was to be adjusted by a repair valuation and having paid the claim pursuant to that valuation formula, it was plaintiff who sought to establish that defendants materially breached the agreement by failing to pay a sufficient amount either for the costs of an actual repair and/or for the business interruption losses that would have been incurred during the course of such a repair.  Obviously, a breach of contract must occur before issues regarding a failure to mitigate arise.  Furthermore, the court thoroughly explained the guiding principles governing the jury's determinations in phase two and carefully articulated each of the categories of damages claimed by plaintiff and the principles to be taken into account in

determining the facts with regard to plaintiff's breach of contract claim and asserted damages. Plaintiff's complaint that it was made to prove its case cannot serve as a basis for a new trial.

The Court's jury instructions in phase two likewise did not improperly place the burden on plaintiff to establish that (1) it would have had a willing buyer to purchase any amount of bauxite the jury found was not produced as a result of the loss of Stacker/Reclaimer No. 2 and (2) it was unable through the exercise of due diligence and reasonable effort to replenish its inventory to a level of surplus at any point from the time it suffered such a loss in production to the point in time when plaintiff claimed to have realized the loss. Establishing these fundamental factual premises was necessary to support a recovery for plaintiff's claimed business interruption losses.

Prior to trial plaintiff sought to recover lost production damages in excess of $11,129,000.00. Of this amount, approximately $9,962,026.00 was based on damages arising from the 2001 deferral agreements. Plaintiff's assertion of such losses and the novel way they should be calculated was introduced late in the litigation and without testimonial support from any of plaintiff's management personnel or trial experts. See Defendants' Response to Plaintiff's Motion in Limine No. 7 Regarding Preparation of Plaintiff's Business Interruption Claim (Doc. No. 146) and supporting exhibits. By the time of trial these damages had "grown" to $15,516,985.00.

The court instructed the jury as follows on this component of plaintiff's claimed damages:

> The policy also entitles plaintiff to recover any "loss resulting from the interruption of business ... caused by ... damage ... to" Stacker/Reclaimer No.2. This is what is known as business interruption insurance. Business interruption insurance is intended to reimburse the insured for business losses that it would not have been incurred if the business had continued to operate without interruption. This protection is applicable to a partial interruption as well as to a total interruption of business. A partial interruption occurs when there is a reduction in the operations of the business, although it is not completely shut down. Plaintiff paid a premium for this added insurance coverage and is entitled to the protection provided by this coverage if the loss of Stacker/Reclaimer No. 2 during the recovery period caused an interruption of business resulting in covered losses and expenses within this section of the policy.

The business interruption protection provided by the policy provides reimbursement for the "ACTUAL LOSS SUSTAINED" by plaintiff, which consists of the "net profit which is thereby prevented from being earned and all of the charges and expenses ... that must continue during the interruption of business." In the current setting these losses would consist of any prevented net profit and any additional expenses and charges that would have been incurred during the period of recovery.

In determining the amount of net profit that plaintiff would have been prevented from earning and the recoverable charges and expenses incurred during the period of recovery, if any, the policy provides that due consideration is to be given to the experience of the business before the date of damage and the probable experience thereafter had the accident to Stacker/Reclaimer No.2 not occurred. These benchmarks are then used in calculating whether any net profits were prevented by the loss of Stacker/Reclaimer No. 2 during the period of recovery.

In arriving at the amount due under this category of covered losses, if any, you must take into account and give due regard to plaintiff's actual production experience predating the accident and decide as a factual matter the amount of production that plaintiff reasonably would have achieved during the period of recovery. These benchmarks by which to measure any loss of net profits are to be determined in a practical way, giving reasonable and sufficient consideration to the experience of the business before the accident and its probable experience thereafter. The policy does not provide a standard period of time to use in setting a benchmark for the pre-accident experience of the business for the purpose of making the appropriate determinations concerning the actual experience of the business before the loss and the probable experience of the business after the loss. Each of these measurements are factual determinations which you are called upon to make after consideration of all of the evidence in the case. So, in determining the experience of the business before the collapse and its probable experience during the period of recovery, it is appropriate to consider all the evidence that reflects on (1) these claimed losses in a common sense way, (2) the production plaintiff reasonably could have anticipated would have been attained, (3) any business projections and/or trends within the bauxite mining industry and (4) any reasonable comparison of the actual experience of plaintiff's business during other periods of time involving similar conditions. You should also take into account whether the period of experience under consideration exhibited either markedly lower levels of production or abnormally higher levels and avoid selecting benchmarks based on a time period that displayed peculiar departures from what you find would be the normal levels of production or the reasonably based expectations of production. You may, however, find that the amount of production that plaintiff reasonably would have achieved during the period of recovery would have exceeded plaintiff's prior past experience if you are so persuaded by the evidence.

After determining the benchmark established from plaintiff's prior business experience and the benchmark reflecting the production that plaintiff reasonably would have obtained during the period of recovery had the collapse not occurred, you must then determine the actual production plaintiff did achieve during the period of recovery. If, during the period of recovery, the amount of actual production is a higher number than the amount of production you find

31

plaintiff reasonably would have achieved, then there can be no loss of net profits during the recovery period. But if the actual production is less than the production plaintiff reasonably would have achieved during the recovery period, then there was a loss in production. If you find a loss of production from the evidence, then you must determine whether the loss of Stacker/Reclaimer No. 2 was a proximate cause of any part of that loss in production. If it was, then for the part of the loss of production that was caused by the loss of Stacker/Reclaimer No.2, you must determine the extent to which the loss of production resulted in a reduction of shipments. If you find as a matter of fact that there was a reduction of shipments that occurred as a result of the loss of production proximately caused by the loss of Stacker/Reclaimer No. 2 during the period of recovery, then you must determine as a matter of fact the amount of net profit plaintiff would have earned for each metric ton that plaintiff was prevented from shipping as a result of the loss of Stacker/Reclaimer No. 2 during the period of recovery.

In order to make an award for the loss of any net profit resulting from the loss of Stacker/Reclaimer No. 2 during the period of recovery, plaintiff must prove by a preponderance of the evidence that a willing buyer would have purchased the amount of bauxite reflected in the lost production occurring during the period of recovery and attributable to the loss of Stacker/Reclaimer No. 2 at some point in time prior to that point after the period of recovery ended when plaintiff was able to bring inventory up to a level where plaintiff had a sufficient surplus of bauxite ready for shipment or could have done so through the exercise of due diligence and reasonable effort. Producing a sufficient surplus means that plaintiff reached or could have reached with the exercise of due diligence and reasonable effort a level of inventory ready for shipment that would have satisfied all outstanding legal obligations for the shipment of bauxite. At the point where such a surplus was or reasonably could have been attained, any lost levels of production and shipments attributable to the loss of Stacker/Reclaimer No. 2 during the period of recovery could no longer have prevented plaintiff from realizing any net profits. You may assume that at the end of the period of recovery plaintiff's production levels would have been restored to a level consistent with plaintiff's pre-accident levels of production. You may also find that the amount of production that plaintiff reasonably would have achieved after the end of the period of recovery would have exceeded plaintiff's prior past experience if you are so persuaded by the evidence. Whether plaintiff's levels of production reached or reasonably could have produced such a level of surplus at any point during the period of time reflected in the evidence is a question of fact that you should consider based on all of the evidence in the case. Whether plaintiff would have had a willing buyer to purchase any amount of bauxite reflected in the lost production occurring during the period of recovery and attributable to the loss of Stacker/Reclaimer No. 2 prior to the point where plaintiff did or reasonably could have produced a surplus of bauxite after the period of recovery ended also is a question of fact that you should decide based on all of the evidence in the case.

Plaintiff challenges the charge on the grounds that it improperly placed a duty on plaintiff to (1) build and make use of inventory outside the period of recovery and (2) prove it would have had a willing buyer for the lost production of bauxite it claimed to have suffered.

Each of these challenges is without merit. Plaintiff's assertions concerning a duty to build inventory "outside the period of recovery" fail to account for plaintiff's use of the deferrals as the basis for a substantial portion of its lost production claim. The policy clearly placed on plaintiff a duty to exercise diligence and dispatch in replacing any property that had been destroyed or damaged. In addition, plaintiff had a duty to use all reasonable means within its control to reduce loss flowing from the interruption of business, including making use of stock, merchandise or other property. And the law clearly placed upon plaintiff a duty to mitigate its damages if it could have done so through the exercise of due diligence and reasonable measures. Plaintiff claimed that although it was paid for the deferred tons in 2001, it lost the ability to realize additional production in 2004 when the deferral amounts were produced. Thus, plaintiff's claim extended the realization of its lost production damages beyond the period of recovery; this extension of the realization of its claimed losses concomitantly extended the corresponding duties to build and make use of inventory placed on plaintiff by the policy and the law.

Furthermore, plaintiff had the burden of proving that had it produced additional bauxite when the deferred tons were produced/taken, at least one of its owners would have taken the additional amount of bauxite that assertedly was diverted from production. The record contained evidence indicating other independent causes affected plaintiff's owners' need for and purchase of bauxite. It also contained evidence suggesting plaintiff was willing to modify the contracts between itself and its owners when the owners so requested. Plaintiff had been paid for the deferred tonnage in 2001 when the memorandums of understanding were entered into between plaintiff and its buyers/owners. And at the time the deferral tons were produced, plaintiff's largest customers/owners were taking both their amounts from regular production and the deferral amounts. Plaintiff was experiencing a record level of production during this time. Under these circumstances plaintiff merely was required to show that because of the production it devoted to fulfilling the deferral agreements, it either had been unable to produce bauxite it was committed to supply to one or more of its owners or that at least one such owner would have

taken more during the time when plaintiff produced the bauxite to fulfill the deferral arrangements.

Plaintiff's burden in this regard did not eviscerate the legal effect of the contracts between plaintiff and its owners. Plaintiff was free to and did argue to the jury that its owners would have taken all the bauxite it could have produced in 2004, and its obligation to produce the amounts reflected in the deferred tonnage necessarily precluded it from producing more bauxite for shipment at that time. Defendants were entitled to argue that plaintiff was attempting to overreach by suggesting that its customers, after consuming plaintiff's record amounts of production during that time, would have taken a substantial amount of additional bauxite.

Plaintiff, having injected into the case a multi-million dollar component of its claimed business interruption losses premised on the contention that it lost the ability to produce more for its customers/owners when the deferral tonnage was produced cannot complain of the obligation to prove the basic factual underpinnings of such a claim. Any actual loss from having to produce the deferral amounts in subsequent years was a question of fact for the jury's consideration that was dependent upon factual proof of both plaintiff's inability to produce the amount needed for the deferral agreements during the interim period through the exercise of due diligence and a showing that at least one of plaintiff's owners would have taken and paid for the bauxite used to fulfill the deferral agreements. Plaintiff simply could not have sustained a loss from the deferrals without a showing of these basic facts. Consequently, these matters properly were submitted to the jury as questions of fact and the court's instruction correctly placed the burden on plaintiff to prove those facts necessary to sustain its theory of business interruption loss.

The record fails to contain any grounds to warrant the exercise of this court's discretion to grant a new trial. Accordingly, plaintiff's motion for such relief will be denied. An appropriate

order will follow.

Date: March 26, 2008

s/ David Stewart Cercone
David Stewart Cercone,
United States District Judge

cc:   Robert W. Doty, Esquire
      Andrew M. Roman, Esquire
      Larry K. Elliott, Esquire
      David F. Russey, Esquire
      Cohen & Grigsby, P.C.
      11 Stanwix Street, 15th Floor
      Pittsburgh, PA misconstrues

      Paul K. Geer, Esquire
      Tara L. Maczuzak, Esquire
      DiBella, Geer, McAllister & Best
      312 Boulevard of the Allies
      3rd Floor
      Pittsburgh, PA 15222

      Thomas S. Gozdziak, Esquire
      James M. Hoey, Esquire
      CLAUSSEN MILLER, P.C.
      10 South LaSalle Street
      Chicago, IL 60603-1098